

# NUMBER 13-10-00396-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

ALMA LINDA VILLARREAL,                                Appellant,

v.

THE STATE OF TEXAS,                                     Appellee.

### On appeal from the 117th District Court of Nueces County, Texas.

# MEMORANDUM OPINION

### Before Chief Justice Valdez and Justices Garza and Vela
### Memorandum Opinion by Justice Rose Vela

Appellant, Alma Linda Villarreal, was indicted[1] along with co-defendants, Vanessa Zuniga and Yolanda Zuniga, for the first-degree felony offense of injury to a child. S*ee* TEX. PENAL CODE ANN. § 22.04(a), (e) (West Supp. 2011). The three were tried together, and a jury found appellant guilty and assessed her punishment at thirty years' imprisonment. By two issues, appellant argues the trial court: (1) abused its discretion by failing to instruct the jury on the lesser-included offense of reckless injury to a child; and (2) erred by charging the jury regarding the nature of her conduct as well as the result of her conduct. We affirm.

## I. FACTUAL BACKGROUND

### A. State's Evidence

This case involves the near-starvation death of three-year-old I.V., who lived with appellant, his biological mother, her girlfriend, Vanessa Zuniga[2], and Vanessa's mother, Yolanda Zuniga. On the afternoon of February 27, 2009, Jose Zuniga, arrived at I.V.'s home and saw appellant crying while Yolanda called an ambulance. Rather than wait for an ambulance, Jose rushed I.V. to Spohn Hospital South emergency room, where I.V. stopped breathing. Amalia Tinoco, M.D., resuscitated him and discovered his blood sugar was 3, which is extremely low. After infusing him with glucose, his blood sugar rose to 79, a normal level. She testified I.V. was dying and looked severely

---

[1] Paragraph one of the indictment alleged, in relevant part, that appellant on or about February 27, 2009, "intentionally or knowingly by omission cause[d] serious bodily injury to [I.V.], a child younger than 15 years of age, by failing to provide adequate nutrition and/or nourishment to [I.V.], and ALMA VILLARREAL had a legal and/or statutory duty to act, namely, ALMA LINDA VILLARREAL is [I.V.'s] mother, . . . ." Paragraph two of the indictment alleged, in relevant part, that appellant on or about February 27, 2009, "intentionally or knowingly by omission cause[d] serious bodily injury to [I.V.], a child younger than 15 years of age, by failing to provide adequate medical care to [I.V.] and ALMA VILLARREAL had a legal and/or statutory duty to act, namely, ALMA LINDA VILLARREAL is [I.V.'s] mother, . . . ."

[2] Vanessa Zuniga's appeal is still pending with this Court.

malnourished and dehydrated. She stated in "a few more minutes his heart would probably have stopped completely, . . . ." Even though appellant told Dr. Tinoco I.V. ate a hamburger at 11:00 a.m. that day, Dr. Tinoco found it very hard to believe that he ate at 11:00 a.m. and by 1:30 p.m., his blood sugar was 3. Dr. Tinoco blamed malnutrition as the cause of his low blood sugar. After treating I.V., she transferred him to Driscoll Children's Hospital.

I.V. arrived at Driscoll in "serious condition." He had "exposure of every bony prominence", "very visible ribs", and "no body fat." His treating pediatrician, Dr. Rivera,[3] testified he "looked like he was malnourished." Appellant told him I.V. was always hungry and always ate a lot but never gained any weight. However, Dr. Rivera testified this account was inconsistent with I.V.'s condition and stated that "usually when somebody is always hungry, it usually kind of steers you away from something that is primarily going on with his, . . . stomach or intestinal tract." He said, "[I]f you ingest normal calories or excess calories a child should be thriving." When the prosecutor asked Dr. Rivera, "[W]ere tests performed on [I.V.] to see if there was an organic reason for him being that way?," he said, "Yes, there were numerous tests . . . but all those tests were basically normal."

About 4:00 p.m. that day, Nancy Harper, M.D., a board certified specialist in child abuse pediatrics, examined I.V. She described him as a "frail, frail appearing child, like a skeleton lying on the bed." She stated his "belly was like all scaphoid, it was sunk down and with the degree of starvation, malnutrition I was seeing." When she asked I.V. if he

---

[3] When the prosecutor called Dr. Rivera as a witness, she did not state Dr. Rivera's first name. Dr. Rivera did not state his first name when he testified.

had eaten anything that day or the day before, he said, "No." He told her he was unable to walk or run. She interviewed appellant, who told her I.V. had eaten plenty of food. Dr. Harper testified this "history was not consistent with what we saw, . . . . If he had been able to eat that many calories in the days leading up to when he came in, he would not have developed life-threatening refeeding syndrome when we started to feed him." She testified he "had extreme starvation from deprivation of food."

Later that day, appellant went to the police station and gave a video-taped statement[4] to Detective Tanya Flores. In this statement, she indicated that in the morning of February 27, 2009, I.V. had eaten three eggs with ketchup, a slice of bread, and a glass of milk.

Belinda Loera, a social worker at Driscoll Children's Hospital, testified that on December 1, 2008, she met with appellant and I.V. at the hospital. Appellant was concerned because I.V. had lost weight, and appellant explained to Loera she "noticed some changes in his [I.V.'s] eating behaviors going on about ten months." Even though appellant told Loera that I.V. "hoarded his food", "would eat everything around him", "ate out of the trash can", and "ate more than his older sisters, who were 10 and 12", appellant could not identify his favorite food and did not know his feeding schedule or his sleeping patterns. Appellant told her Vanessa was I.V.'s primary caregiver. Regarding the events of February 27, 2009, appellant told Loera I.V. had breakfast that morning and usually ate three scrambled eggs, ketchup, a slice of toast and a glass of milk. Around eleven or twelve, she passed by I.V.'s room and found him unresponsive, limp, and barely

---

[4] During the State's case-in-chief, the trial court admitted the videotape into evidence as State's exhibit 2. The prosecutor played the tape to the jury.

4

breathing. Appellant told Loera, "she [appellant], Vanessa, and Yolanda were caretakers at that point." Loera testified this "was a change compared to my assessment before." When the prosecutor asked Loera, "So she said that all three of them took care of him [I.V.] now, rather than just Vanessa?," she said, "Yes."

Appellant's oldest daughter, A.G.G., who lived with I.V., noticed I.V. was getting "skinny" and "was always laying down." She testified he did not get to eat every day and said Vanessa was the one who would not let him have food. She stated there were times when Vanessa would make her eat in front of I.V. and would not let him have any food. Sometimes Vanessa would deprive him of food for one meal, an entire day, or more than one day. When the prosecutor asked A.G.G. what appellant would do when Vanessa would not let I.V. eat, she said, "She wouldn't be there, or at work, or doing something else downstairs." When asked if appellant would feed I.V., she said, "We were the ones that fed him." By "We" she meant herself, her younger sister, and Vanessa.

On cross-examination, defense counsel asked A.G.G. about a birthday party which occurred about two weeks before I.V. was rushed to the hospital ER. A.G.G. recalled I.V. attended the party and was "real skinny" and had "real loose skin." She testified he was "always hungry" and "always in his room laying down under the covers." She said appellant would go to work early in the morning and return home by lunch time. When defense counsel asked A.G.G., "Do you think that Vanessa at any time tried to keep him [I.V.] from having food?," she said, "Sometimes."

Appellant's second oldest daughter, A.G., who also lived with I.V., replied, "Yes, I think" when asked if appellant knew "that Vanessa wouldn't give [I.V.] food?" She said

that when appellant "would take Vanessa out, she [appellant] would call for my grandma Yoli [Yolanda Zuniga] to give him food."  When the prosecutor asked her, "But Were [sic] there days that [I.V.] still didn't get to eat in the whole day?," she said, "Yes."  According to A.G., Yolanda only gave I.V. food when Vanessa was gone and Vanessa "sometimes" got mad when people gave I.V. food.  She said Vanessa would spank I.V. with a belt, hit him with her hand, and spit on him.

On cross-examination, when defense counsel asked A.G., "Do you know why he [I.V.] was skinny?," she said, "Because Vanessa starved him."  A.G. testified that at night, I.V. ate food out of the garbage can.

## B. Defense Evidence

Vanessa's cousin, Rosa Ramirez, visited appellant's home numerous times.  She noticed I.V. was always skinny and his ribs were visible.  She told appellant I.V. looked skinny.  Vanessa's niece, Samantha, testified she never saw anyone prevent I.V. from eating, and she never saw appellant act mean towards him.

Vanessa's sister, Lisa Ramirez, testified that when she went to Vanessa's house, she never saw anyone denying I.V. food or liquids.  However, she saw him "being extremely skinny."  She stated appellant "always worried about why he was so skinny. . . . [A]nd that's why she had took him to the doctor, because he would eat all the time and then his stomach would get real hard."

Vanessa's cousin, Jessica Marquez, testified that every time she saw I.V., he was eating.  She never saw anyone mistreating him but said he was "real skinny."

6

Vanessa's cousin, Sylvia Marquez, testified that when she saw I.V., he was "thin." However, she did not think anything was wrong with him and never saw anyone deny him food or water. She said Vanessa and appellant took responsibility for making sure the kids were dressed and fed.

Appellant's sister, Amy Valdez, testified appellant never abused the children and never kept them from eating. Rebecca Andrade, who used to baby sit appellant's children, testified none of appellant's children ever told her they were being abused by anyone. However, she testified I.V. looked "very skinny."

Yolanda Zuniga testified that in December 2008, appellant took I.V. to Driscoll Children's Hospital because appellant was concerned about him being thin. After his discharge, appellant told her, "'They said it was just failure to thrive'" and "'there is nothing wrong with him.'" She stated appellant "told me that they had told her just to follow up in a couple of days." When the prosecutor asked Yolanda, "Did you ever ask [appellant], 'Why didn't you take him back, . . . ?,'" Yolanda answered affirmatively and said appellant "would say she was going to set up an appointment for him." When asked, "And did she set up an appointment for him?," she said, "I guess not." During January and February 2009, I.V. continued to be very thin, and Yolanda told appellant about his condition. Yolanda claimed to have fed I.V. during this two-month period and never saw anyone deny him food. She told the police she, Vanessa, and appellant took charge of taking care of the children and that typically Vanessa fed them. Yolanda said the last few days before I.V. was taken to Spohn Hospital, "he . . . look[ed] like he is starved." She told appellant that "[I.V.] is very skinny. Take him to the doctor."

7

Vanessa Zuniga testified she never abused I.V.  When asked about the events leading up to I.V.'s hospitalization in December 2008, she said, "He [I.V.] started losing too much weight and we were worried about him so she [appellant] . . . and my mom [Yolanda] took him to the hospital . . . and that's when they told her that he looked like he was starving. . . ."  After I.V. was discharged, appellant told Vanessa "he had to come see the doctor again in a couple of days."  According to Vanessa, appellant did not bring I.V. back to the doctor as requested.  Vanessa said she never withheld food from I.V. and stated, "I did not starve [I.V.].  He was always fed either by me, by his mother, by my mother, by friends, . . . .  He was not starved."

Appellant testified she took I.V. to Driscoll Children's Hospital in December 2008 because "I saw he was losing weight."  While at Driscoll, I.V. was examined by Jennifer Davis, M.D., who told appellant, "'Oh, my God.  He looks like he is starving.'"  In reply, appellant told Dr. Davis, "'Yes, he does.'"  She told Dr. Davis that even though "'he eats a lot.,'" "he is not gaining no weight, . . . ."  Dr. Davis admitted I.V. into the hospital, where he stayed for about four days.  Appellant testified that while I.V. was in the hospital, he was examined by Dr. Flores, who told her I.V. "could be stressing over something. . . .  [S]omething in his head, he could be jealous because I had had a baby, because he wasn't the baby no more."  When I.V. was discharged, no one gave appellant any instructions.

She stated in February 2009, she took I.V. to the Spohn Hospital ER.  When defense counsel asked her if she "at any time had anything to do with [I.V.] collapsing prior to going to Spohn?," she said, "No" and stated she never told Dr. Tinoco I.V. ate a

8

hamburger the day he arrived at the ER. When defense counsel asked her, "Did you intentionally or knowingly keep [I.V.] from receiving nutrition and food?," she said, "No I did not." When asked, "Did you intentionally, knowingly, and by omission not try to seek medical attention for your son?," she said, "No." When asked why she did not call the doctor between the time I.V. was discharged in December 2008 and taken to the ER in February 2009, she said, "[H]e was fine. He had none of those symptoms. He was fine. He was himself. . . . I did what they told me to do, take him home, do what you've been doing; that's what I did." However, when asked, "Do you feel that whatever happened to [I.V.] is your responsibility?," she said, "He is my son; yes."

On cross-examination, appellant testified the reason she did not take I.V. to the doctor on February 26, 2009 was because I.V. "didn't want to go. He don't like doctors." She also said, "[H]e was fine." However, when the prosecutor asked her, "Is that your job as a parent, to do what your children need, regardless of whether or not they like it?," she said, "Yes, it is."

## II. DISCUSSION

### A. Lesser Included Offense Instruction

By her first issue, appellant contends the trial court abused its discretion by failing to instruct the jury on the lesser-included offense of reckless injury to a child.

#### 1. Applicable Law

"Determining whether a defendant is entitled to a lesser-included-offense instruction requires a two-part analysis." *Goad v. State*, 354 S.W.3d 443, 446 (Tex. Crim. App. 2011) (citing *Hall v. State*, 225 S.W.3d 524, 528 (Tex. Crim. App. 2007)).

9

"We first consider whether the offense contained in the requested instruction is a lesser-included offense of the charged offense." *Id.* (citing *Rice v. State*, 333 S.W.3d 140, 144 (Tex. Crim. App. 2011); *Hall*, 225 S.W.3d at 535). "If so, we must decide whether the admitted evidence supports the instruction." *Id.* (citing *Rice*, 333 S.W.3d at 144). Reckless injury to a child is a lesser-included offense of intentional or knowing injury to a child. *Torres v. State*, 979 S.W.2d 668, 670 n.2 (Tex. App.—San Antonio 1998, no pet.); *Downing v. State*, 761 S.W.2d 881, 883 (Tex. App.—Fort Worth 1988, no pet.).

"The evidence supports an instruction on a lesser-included offense if it permits a rational jury to find the defendant guilty only of the lesser-included offense." *Goad*, 354 S.W.3d at 446 (citing *Rice*, 333 S.W.3d at 145). "'[T]here must be some evidence directly germane to the lesser-included offense for the finder of fact to consider before an instruction on a lesser-included offense is warranted.'" *Id.* (quoting *Hampton v. State*, 109 S.W.3d 437, 441 (Tex. Crim. App. 2003)). "We consider all of the evidence admitted at trial, not just the evidence presented by the defendant." *Id.* (citing *Rousseau v. State*, 855 S.W.2d 666, 672 (Tex. Crim. App. 1993)). "The evidence must establish that the lesser-included offense is a valid, rational alternative to the charged offense." *Id.* (citing *Rice*, 333 S.W.3d at 145). "'Anything more than a scintilla of evidence is sufficient to entitle a defendant to a lesser charge.'" *Id.* (quoting *Bignall v. State*, 887 S.W.2d 21, 23 (Tex. Crim. App. 1994)). "However, we may not consider '[t]he credibility of the evidence and whether it conflicts with other evidence or is controverted.'" *Id.* at 446–47 (quoting *Banda v. State*, 890 S.W.2d 42, 60 (Tex. Crim. App. 1992)).

10

## 2. Analysis

Concerning the offense of injury to a child, the penal code provides, in relevant part:

(a) A person commits an offense if he intentionally, knowingly, recklessly, or with criminal negligence, by act or intentionally, knowingly, or recklessly by omission, causes to a child, . . .:

    (1) serious bodily injury;

    (2) serious mental deficiency, impairment, or injury; or

    (3) bodily injury.

TEX. PENAL CODE ANN. § 22.04(a)(1)–(3). Section 6.03 of the penal code defines the culpable mental states relevant to this case as follows:

(a) A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result.

(b) A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist. A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

(c) A person acts recklessly, or is reckless, with respect to circumstances surrounding his conduct or the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.

*Id.* § 6.03(a)–(c) (West 2003).

In *Williams v. State*, the Fort Worth Court of Appeals interpreted the distinction between the culpable mental state of "recklessness" and the culpable mental states of

11

"intentional" and "knowing" as follows:

> *Recklessness*, defined in Subsection (c), differs markedly from intentional and knowing. Recklessness is conscious risk creation; the reckless person does not desire that the risk occur nor is he even reasonably certain that it will occur; he does perceive it, however, and if the risk is substantial, he disregards it, and his disregard is plainly unjustifiable, then he is criminally responsible for whatever harm his recklessness produced.
>
> Many examples of recklessness come to mind. Driving while intoxicated, speeding through a school zone when children line the sides of the street, plinking at beer cans in a lake while water skiers go by in the center of the lake, chasing a traffic violator through a residential area at 100 miles an hour. In all of these examples the fact-finder would infer that the actor perceived the risk—of running down a child, of shooting a skier, of smashing into a parked car—and that he consciously disregarded it.

*Williams v. State*, 704 S.W.2d 156, 158 (Tex. App.—Fort Worth 1986, no pet.) (citation omitted).

The evidence in this case established appellant is the biological mother of I.V., the injured three-year-old child. She was responsible for caring for the child. In December 2008, she took him to Driscoll Children's Hospital, where he was admitted. Even though I.V. was thin, he was sufficiently healthy for hospital staff to eventually discharge him to appellant's care. Thereafter, I.V. remained skinny, and the evidence showed appellant knew he was skinny. While living with appellant, I.V. nearly died from malnutrition and dehydration. The evidence does not show appellant took I.V. to the doctor after his December 2008 discharge from Driscoll Children's Hospital. When he arrived at Spohn Hospital South on February 27, 2009, he had stopped breathing. Even though appellant told Dr. Tinoco I.V. ate a hamburger at 11:00 a.m. that day, Dr. Tinoco found it very hard to believe he ate at 11:00 a.m. and his blood sugar was 3 by 1:30 p.m. Dr. Tinoco

12

blamed malnutrition as the cause of his low blood sugar.

Appellant testified the reason she did not take I.V. to the doctor on February 26, 2009 was because he "didn't want to go. He don't like doctors." She also stated, "[H]e was fine." However, on February 27, 2009, I.V. told Dr. Harper he had not eaten that day or the day before. When he was brought to Driscoll Children's Hospital on February 27, 2009, Dr. Harper described him as a "frail, frail appearing child, like a skeleton lying on the bed." The evidence does not show appellant had a visual impairment which kept her from seeing I.V.'s physical condition. I.V. could not have looked "fine" on February 26, 2009 when the next day he looked "like a skeleton lying on the bed."

We do not find conduct of this nature to be of a similar character with the examples cited by the *Williams* court as examples of recklessness. All of the cited examples are acts which create a risk of harm but are not necessarily harmful in and of themselves. The omissions committed by appellant were of a different character in that her conduct was directly harmful to the child. The evidence showed it was appellant's intention to cause serious bodily injury to I.V. No evidence exists that if appellant is guilty, she is guilty only of the lesser-included offense of recklessly causing bodily injury to a child. Therefore, we hold the trial court did not err by failing to instruct the jury on the lesser-included offense of recklessly causing serious bodily injury to a child. Issue one is overruled.

**B. Culpable Mental State**

In her second issue, appellant contends the trial court erred in charging the jury with respect to the nature of her conduct as well as the result of her conduct.

13

**1. Standard of Review for Charge Error**

"[A]n appellate court's first duty in evaluating a jury charge issue is to determine whether error exists. Then, if error is found, the appellate court should analyze that error for harm." *Middleton v. State*, 125 S.W.3d 450, 453 (Tex. Crim. App. 2003). If, as in the case before us, "no proper objection was made at trial and the accused must claim that the error was 'fundamental,' he will obtain a reversal only if the error is so egregious and created such harm that he 'has not had a fair and impartial trial'—in short 'egregious harm.'" *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984).

**2. The Court's Instruction**

Injury to a child is a result-oriented offense, requiring a mental state that relates not to the specific conduct but to the result of that conduct. *Williams v. State*, 235 S.W.3d 242, 750 (Tex. Crim. App. 2007). In the case before us, appellant was charged with intentionally or knowingly engaging in conduct that caused serious bodily injury to a child younger than fifteen years of age. Without objection, the trial court instructed the jury with the full text of the language set forth in section 6.03(a) of the Texas Penal Code: "A person acts intentionally, or with intent, *with respect to the nature of his conduct or to* a result of his conduct when it is his conscious objective or desire *to engage in the conduct or* cause the result." TEX. PENAL CODE ANN. § 6.03(a) (emphasis added). Because injury to a child is a result-oriented crime, the definition of "intentionally" submitted to the jury should have focused exclusively on the result of the conduct.

14

### 3. Harm Analysis

Having determined the trial court erred by failing to properly instruct the jury, we examine the record to determine whether appellant was egregiously harmed. *Almanza*, 686 S.W.2d at 171. Any harm that is inflicted by the erroneous charge must be "assayed in light of the entire jury charge, the state of the evidence, including the contested issues and weight of the probative evidence, the argument of counsel, and any other relevant information revealed by the record of the trial as a whole." *Id.*; *see Ngo v. State*, 175 S.W.3d 738, 750 n.48 (Tex. Crim. App. 2005). "Jury-charge error is egregiously harmful if it affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory." *Stuhler v. State*, 218 S.W.3d 706, 719 (Tex. Crim. App. 2007) (citing *Hutch v. State*, 922 S.W.2d 166, 171 (Tex. Crim. App. 1996)). We engage in this assessment to illuminate the actual, not just theoretical, harm to the accused. *Almanza*, 686 S.W.2d at 174. In addition, egregious harm is a difficult standard to meet and must be determined on a case-by-case basis. *See Hutch*, 922 S.W.2d at 171.

In the present case, the application paragraph specific to appellant charged the jury to find her guilty only if she "intentionally or knowingly by omission cause[d] serious bodily injury to [I.V.], . . . ." When the facts, as applied to the law in the application paragraph, point the jury to the appropriate portion of the definitions, no harm results from the trial court's failure to limit the definition of culpable mental states in the abstract portion of the charge. *Hughes v. State*, 897 S.W.2d 285, 296–97 (Tex. Crim. App. 1994); *see also Medina v. State*, 7 S.W.3d 633, 640 (Tex. Crim. App. 1999); *Patrick v. State*, 906 S.W.2d 481, 492–493 (Tex. Crim. App. 1995). In the present case, the application

15

paragraph applicable to appellant did correctly limit the jury's consideration to a result-oriented offense in which she intentionally or knowingly caused serious bodily injury.

In addition, during guilt-innocence closing argument, appellant's defense counsel argued that the evidence failed to show appellant did anything to intentionally or knowingly hurt I.V. and alluded to the State's theory that appellant deprived her son of food. Accordingly, both the application paragraph and defense counsel's argument steered the jury to the correct mental state for a result-oriented offense.

Finally, appellant's theory of defense throughout the trial, and as explained in final argument, was that her son's weight loss was not caused by appellant's failure to feed or care for him, but by other medical conditions, including diabetes and sickle cell anemia. Accordingly, even if the jury had been confused about the necessary mental state and thought that it could find appellant guilty if she intentionally or knowingly starved I.V., but without the intent to cause serious bodily injury, that was not the theory of defense and, realistically, would not have helped appellant. A child like I.V., who is nearly starved to death, is a seriously injured child and it strains common sense to believe a jury would have found appellant intended not to feed or care for the child but failed to find she thereby intended to, or knew that it would, cause him serious bodily injury.[5]  Issue two is overruled.

---

[5] "'Serious bodily injury' means bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss of impairment of the function of any bodily member of organ."  TEX. PENAL CODE ANN. § 1.07(a)(46) (West 2011).

### III. Conclusion

We affirm the trial court's judgment.

ROSE VELA
Justice

Do not publish.
Tex. R. App. P. 47.2(b).

Delivered and filed the
5th day of April, 2012.

17